DECISION.
{¶ 1} The defendant-appellant, Pele K. Bradford, appeals from his convictions for aggravated murder, a violation of R.C. 2903.01(A), and having a weapon while under a disability, a violation of R.C. 2923.13(A). The aggravated-murder charge was accompanied by two gun specifications. After a jury found Bradford guilty of the charges, the trial court imposed the mandatory sentence for the aggravated murder — imprisonment for life with eligibility for parole in twenty years — and the maximum one-year sentence for the weapons offense. After merging the two gun specifications, the court sentenced Bradford to an additional mandatory three years. The prison terms were ordered to be served consecutively.
 {¶ 2} In his two assignments of error, Bradford now asserts (1) that his convictions were contrary to the weight of the evidence, and (2) that the trial court erred in excluding from evidence a police report that suggested the possibility of another suspect. For the following reasons, we affirm.
 TESTIMONY
1. AMBER SCOTT
 {¶ 3} Amber Scott testified that on January 2, 2004, she was working as a waitress at Ollie's Trolley, a restaurant located on Elm Street in the Over-the-Rhine area of Cincinnati, Ohio. When her shift ended in the afternoon, she left the restaurant in the company of her sister, Robin Godby, and her sister's friend, Shawana Dubois, also known as "Queenie." As the trio made their way to Scott's car, Scott saw an old boyfriend, David Brown, with whom she stopped to talk for approximately five minutes. During the conversation, Scott heard her cellular telephone ring and looked at the faceplate to determine the identity of the caller. The caller was Bradford, her current boyfriend with whom she was living. Scott testified that she chose not to answer the call since she was in the middle of a conversation with Brown.
 {¶ 4} Scott soon ended her conversation with Brown and then walked with Robin and Queenie to Scott's car. As she began to pull out, Bradford's white Ford Explorer appeared alongside her car. Bradford was alone in the Explorer. Scott stepped out of her car to speak to him. She later identified Bradford to police as wearing a white coat with black stripes on the sleeves, as well as what she described as a "skullcap."
 {¶ 5} According to Scott, Bradford asked her to whom she had been speaking. Scott described Bradford as unhappy but apparently not mad that she had been speaking to another male. When she informed Bradford that she had been speaking to Brown, Bradford, according to Scott, did nothing but stare. She described how he then drove off. When questions arose concerning her testimony about Bradford's state of mind as he drove away, Scott acknowledged that she had given a statement to detectives and testified in front of the grand jury that Bradford had appeared upset and that the tires of the Explorer had squealed as the vehicle took off.
 {¶ 6} Scott then returned to her car, in which Godby and Dubois were sitting, and began to drive home. When several minutes later she turned a corner, she saw several police cars surrounding a body lying in the street. She testified that she recognized the body as Brown's, and that she immediately turned around and returned to Ollie's Trolley. Someone at the restaurant then made a call to the 911 operator.
 {¶ 7} Scott was interviewed by police detectives that night and chose not to return to the apartment that she shared with Bradford. She stated that she spoke to Bradford that night and again the next day, when he called to inquire when she planned to return home. She stated that during the second conversation she asked Bradford "why did he do that?" She explained that her question was intended to elicit from Bradford whether he had anything to do with Brown's murder. According to Scott, Bradford did not answer the question. Although Scott claimed that she was not afraid to return to the home that she shared with Bradford on the night of the murder, she admitted that she had requested a police escort so that she could return to the apartment to retrieve her belongings.
 {¶ 8} Scott testified that, notwithstanding the charges against Bradford, she had remained his girlfriend and still considered herself Bradford's girlfriend at the time of the trial.
2. ROBIN GODBY
 {¶ 9} Godby testified that when Brown and Scott first encountered each other on the street, they embraced and hugged. Later, when Bradford appeared next to her sister's car, it was her impression that Scott had been "busted" (a term used by the prosecutor and acquiesced to by Godby) for having contact with an ex-boyfriend. She stated that when Scott returned to her car after speaking to Bradford, she appeared "nervous." She described Bradford as speeding away after speaking to her sister, but she added that Bradford always drove fast. Unlike Scott's statements to police detectives, Godby could not remember Bradford wearing a hat when he pulled alongside them in the Explorer.
3. SERGEANT DWAYNE WILSON
 {¶ 10} Sergeant Dwayne Wilson of the Cincinnati Police Department testified that on the afternoon of the murder he was working a private detail at Hart Realty on Race Street. He testified that not long after 3:00 p.m. he was standing inside the building next to the front door and heard a loud pop. Stepping outside, he heard four or five more pops, which he now associated with gunshots. He stated that he saw a person running on Liberty Street, and that the person was wearing a gray skullcap and a black jacket with white stripes going down the sleeves. According to Wilson, the person appeared to be of rather stocky build and either ten or eleven inches above five feet in height. He could not tell whether the person running had anything in his hands. As Wilson continued down Liberty Street, people in cars began pointing out to him a body lying in the street. Wilson stopped momentarily to investigate the body as the person running continued up Liberty Street and turned right at the corner of Pleasant Street. When Wilson arrived on Pleasant Street moments later, the person running was no longer visible. No one else on the street claimed to have seen the suspect.
4. SHANEY WILFORD
 {¶ 11} Shaney Wilford, who was seventeen years old at the time of the trial, testified that on January 2, 2004, she was standing in front of the Alabama Fish Bar at the corner of Race and Liberty streets and talking to an individual when another man approached the individual in a confrontational manner. She testified that she instinctively sensed that "something was going to go down," and that, as she was walking away, she overheard the interloper say, "That's my bitch." Wilford stated that she then glanced back quickly, noting the interloper's general appearance, and that the next thing she heard was a gunshot. Wilford then entered the Alabama Fish Bar and through the window watched as the interloper fired two more shots into the individual she had been speaking to, who was now lying prone in the middle of the street. She stated that the interloper then ran toward Pleasant Street, where he got into a white car. According to Wilford, the interloper was wearing something that resembled a black bubble coat and was hatless.
 {¶ 12} Wilford stated that later that day her mother accompanied her to the police station, where she told her interviewers what she had seen and then viewed a photographic array. At trial, she positively identified Bradford as the man who had shot Brown.
5. DONNA LEWIS
 {¶ 13} Donna Lewis testified that on January 2, 2004, she was driving a truck on Liberty Street at approximately 3:30 p.m. when she heard some popping sounds and saw two men run into the street. She stated that she witnessed one of the men shoot the other three or four times. She described the shooter as "[v]ery determined and totally fixed on his mission." Because of what she saw, Lewis stated that she was determined to "gather as much information about [the shooter] as I could." She described the shooter as "not particularly tall" and "rather stocky," wearing a "black jacket, [a] kind of sporting jacket with wide white stripes down the arms." She stated that she also detected some facial hair, possibly a moustache. She described his pants as charcoal-colored and "kind of baggy."
 {¶ 14} According to Lewis, she remained on the scene and later spoke to police officers. She testified that she was not able to positively identify anyone from a photographic array shown to her. She stated that she had never been close enough to the shooter to be able to positively identify him, even if they were to meet face-to-face.
6. RODNEY PENCE
 {¶ 15} Rodney Pence, who was eleven years old when he testified, stated that he had witnessed the shooting from the backseat of his mother's truck. According to Pence, the shooting took place ten feet in front of his mother's vehicle. He testified that the shooter was wearing "a skullcap and a black jacket." Although he testified that he had trouble identifying the shooter from a photographic array shown to him by the police two days later, he stated that he would know the person if he saw him again, and then he made a courtroom identification of Bradford as the shooter. On cross-examination, asked by defense counsel if anyone had told him that the shooter would be in the courtroom, Pence replied, "Kind of."
7. WINOWA PENCE
 {¶ 16} Winowa Pence, Rodney's mother, testified that she also witnessed the shooting. She described the shooter as wearing a black jacket that resembled a bubble jacket, dark jeans, white shoes, and a skullcap. She described him physically as "real tall and stocky" with a faded goatee. She gave his height as either one or two inches over six feet. She estimated that her observations were drawn from a distance of ten to fifteen feet. She stated that after she contacted the police she was able to make a positive identification of Bradford from a photographic array, and she then made a courtroom identification of Bradford as the man who had shot Brown. Asked how she could be sure, she stated, "Something like that happens and you never forget it and you dream about it and you have nightmares about it. You see the face in your dreams * * *. I mean, how could you forget something like that?"
8. GARY HERMAN
 {¶ 17} Gary Herman, a senior criminalist with the Cincinnati Police Department, testified that he and his partner, Ronald Camden, arrived at the scene of the Brown murder at approximately 3:45 p.m. He testified that they recovered four spent shell casings and one live round of the .380 Car-Bon ammunition that he believed was used to kill Brown. He testified that the shell casings were not tested for fingerprints due to the unlikelihood that a set of prints would have survived the heat generated during firing, and that the live round was not tested because the dampness of the weather reduced the chances of any good set of prints being obtained. He stated that some 9mm shell casings were also found in the vicinity, but that these were not considered connected to the Brown shooting.
9. JEFFREY SCHARE
 {¶ 18} Jeffrey Schare, a homicide specialist with the Cincinnati Police Department, testified that Scott and Godby were interviewed the same day that Brown was murdered, and that, as a result of those interviews, Bradford was developed as a suspect. He testified that a records check showed that Bradford owned several vehicles, one of which was a white Ford Explorer. Schare testified that he was able to obtain a photograph of Bradford that was several years old, and that he used it in an array of six photographs that he showed to witnesses. He testified that Winowa Pence identified Bradford from the array. He stated that Rodney Pence picked out two photographs of other people. He stated that Lewis was unable to make an identification. According to Schare, Wilford picked out the photograph of Bradford as either the shooter or the victim.
 {¶ 19} Schare testified that he attempted to find Bradford at his address during the investigation, but was unable to locate him. He stated that a search of Bradford's residence failed to disclose any jacket resembling that described by witnesses as worn by the shooter, although a gray skullcap was found. He stated that Bradford subsequently surrendered to police after his indictment.
10. DR. CYNTHIA GARDNER
 {¶ 20} Dr. Cynthia Gardner, a Hamilton County deputy coroner, testified that Brown died from injuries to his spine and brain from multiple gunshot wounds.
11. WILLIAM SCHRAND
 {¶ 21} William Schrand, a senior firearms examiner for the Hamilton County coroner's crime laboratory, testified about the ammunition that was recovered from Brown's body and about the spent shell casings and one live round found on the scene. He stated that the markings on each were consistent. On cross-examination, he conceded that .380 Car-Bon bullets were "very common."
 WEIGHT OF THE EVIDENCE {¶ 22} In his first assignment of error, Bradford asserts that his convictions were against the manifest weight of the evidence. In his view, the testimony presented at trial was fraught with "numerous examples of inconsistency and weakness." We disagree.
 {¶ 23} When a court reviews the record on a weight-of-the-evidence challenge, the court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of disputed facts. State v. Thompkins,78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. If, after reviewing the record and weighing the evidence and testimony, the reviewing court determines that the jury clearly lost its way and created a manifest miscarriage of justice, then the conviction should be reversed and a new trial ordered. Id. But the power to do so is discretionary and should only be exercised "`in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717.
 {¶ 24} Although the state's case against Bradford relied in some measure on circumstantial evidence, the standard of review is still the same. "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subject to the same standard of proof. When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph one of the syllabus.
 {¶ 25} Here, there was compelling circumstantial and eyewitness evidence against Bradford. Scott's testimony established that Bradford had witnessed her speaking to Brown, an ex-boyfriend, and that the sight of them together had provoked Bradford into placing a telephone call to her during the conversation and then pulling alongside her vehicle only moments later for some sort of explanation. Although Scott, who was still romantically involved with Bradford at the time of trial, was clearly concerned with minimizing Bradford's emotional state, it is clear from her testimony, as well as the testimony of Godby, that Bradford was unhappy that Scott and Brown had been speaking. Bradford then drove off, and minutes later Brown, according to Wilford, was confronted on the sidewalk in front of the Alabama Fish Bar by a man who told him, "That's my bitch," and then proceeded to chase him into the street, finally shooting him dead.
 {¶ 26} Were this not enough, several witnesses came forward and described the jacket the shooter was wearing as similar to the one Scott had described Bradford as wearing (either black or white with stripes of the opposite color running down the sleeves). Winowa Pence was able to positively identify Bradford from a photographic array soon after the shooting, and then she later positively identified him in court. Similarly, Wilford was able to identify Bradford's photograph as depicting one of the two men she had seen involved in the shooting, and at trial she specifically identified Bradford as the shooter. She also stated that she had seen the shooter leave the scene of the murder and get into a white vehicle, in other words a vehicle the same color as Bradford's SUV.
 {¶ 27} The defense did not present any witnesses. Bradford's argument to the jury consisted primarily of pointing to inconsistencies in the eyewitness testimony, as well as the inability of certain witnesses to select his photograph from the array shown them. But Schare's testimony made clear that the photograph of Bradford that the police were using was several years old, and certainly the positive identifications made by Winowa Pence and Wilford were significant in that neither witness had had any prior familiarity with Bradford. Further, Bradford's argument that there was no evidence that he was angry at seeing Brown and Scott together was belied by Scott and Godby's testimony, as well as the fact that Scott evidently did not feel safe returning to their shared residence without a police escort. Scott testified that when she spoke to Bradford the day after the murder, she asked him, "Why did you do that?" — a question that makes little sense unless Bradford had indeed displayed some anger when he confronted her over her encounter with Brown.
 {¶ 28} Finally, although Bradford decries the failure of the state to have produced the murder weapon and other physical evidence, such evidence was not necessary to convict him. See State v. Paramore (Sept. 19, 1997), 1st Dist. No. C-960799.
 {¶ 29} In sum, we conclude that this is not the exceptional case where the evidence weighed heavily against conviction. Indeed, sitting as a thirteenth juror, we arrive at the same conclusion that the jury reached — that Bradford, incensed over seeing Scott talking to Brown, an ex-boyfriend, hunted him down and executed him in the middle of the street.
 {¶ 30} Bradford's first assignment of error is overruled.
 EXCLUDED EVIDENCE {¶ 31} In his second assignment of error, Bradford argues that his defense was prejudiced when the trial court refused to allow him to introduce a police report that made reference to the possibility of a white suspect (Bradford is African-American). The entire contents of the police report were read during the testimony of Schare, who explained that police canvassing the neighborhood had gleaned the name of one or two witnesses who claimed that they had seen a white suspect. Schare explained that these witnesses could not be found and that their information was dismissed after numerous eyewitnesses came forward to identify the shooter as an African-American male. In denying Bradford's motion to have the police report admitted, the trial court noted that the report had been read to the jury and its contents made the subject of repeated questioning by both sides. In excluding the report, the court stated its preference for the testimonial evidence and ruled that the report would be cumulative to that evidence.
 {¶ 32} It is well settled that evidentiary rulings are within the broad discretion of the trial court, and that, even if an abuse of that discretion, an evidentiary ruling will not be the basis for reversal unless there is a reasonable possibility that the ruling contributed to the conviction. State v. Thompson (1981), 66 Ohio St.2d 496,422 N.E.2d 855. Given that the contents of the police report were fully read to the jury and their import probed at length during cross-examination, we cannot say that the trial court abused its discretion by excluding the report itself, or that the exclusion contributed in any way to Bradford's conviction.
 {¶ 33} Bradford's second assignment of error is overruled.
 {¶ 34} Accordingly, the judgment of the trial court is affirmed.
Judgment affirmed.
Hildebrandt, P.J., Gorman and Painter, JJ.